# In the United States Court of Federal Claims

No. 03-2154C

(Filed: April 18, 2007)

```
*************************************  *
                                      *  Contract  Disputes  Act;  Default
                                      *  Termination  of  Building  Lease;
MORELAND CORPORATION and              *  Agency's Failure to Allow Lessor to
LAS VEGAS VA1 LLC,                    *  Make  Repairs;  Agency's  Failure  to
                                      *  Show Constructive Eviction or Denial
                  Plaintiffs,         *  of  Beneficial  Use  or  Enjoyment;
                                      *  Contracting  Officer  Abuse  of
v.                                    *  Discretion;  Agency's  Bad  Faith
                                      *  Conduct;  Effect  of  Statements  in
THE UNITED STATES,                    *  Different  Lawsuit;  Damages;  No
                                      *  Restriction  From  Termination  for
                  Defendant.          *  Convenience Clause.
                                      *
*************************************  *
```

*Robert J. Symon*, with whom was *Eric A. Frechtel*, Bradley Arant Rose & White LLP, Washington, D.C., for Plaintiffs.

*Brian S. Smith*, with whom were *Peter D. Keisler*, Assistant Attorney General, *David M. Cohen*, Director, and *Donald E. Kinner*, Assistant Director, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., for Defendant.

## OPINION AND ORDER

WHEELER, Judge.[1]

## Introduction

This case involves a timely appeal by the Moreland Corporation ("Moreland") under the Contract Disputes Act, 41 U.S.C. § 601 et seq., from the Contracting Officer's default termination of a Government building lease in Las Vegas, Nevada.  The Department of Veterans Affairs ("VA") contracted with Moreland in September 1995 to construct a two-

---

[1] This case was transferred to Judge Thomas C. Wheeler on December 9, 2005, pursuant to Rule 40.1(b) of the Rules of the Court of Federal Claims ("RCFC").

story building in Las Vegas to be used as a VA medical clinic.  After Moreland completed construction of the building in 1997, the VA took occupancy and began its monthly rental payments under a 15-year lease.  Moreland financed the design and construction costs of the building with the expectation that those costs would be recouped through the VA's monthly rental payments under the Lease.

The VA terminated the Lease for default on September 12, 2002, but continued to occupy the building until June 30, 2003.  At that point, the VA ceased its monthly rental payments to Moreland, and moved to other facilities.  Moreland filed suit in this Court on September 11, 2003 within the one-year period for appeal under 41 U.S.C. § 609(a)(3), requesting *de novo* review of the default termination.  Moreland asserts a wrongful termination under a number of legal theories, and claims the value of the remaining monthly payments under the Lease, less operating expenses, plus the value of the building that it lost through foreclosure after termination.  Adding the net unpaid rent of $17,992,215.85 and the lost asset value of $20,000,000, Moreland's total claim is $37,992,215.85, plus interest and attorneys' fees.

The Contracting Officer terminated the Lease for default because Moreland allegedly failed to repair structural deficiencies in a timely manner, and because the VA's engineering consultant found the building unsafe for continued occupancy.  Defendant contends that the facility as originally constructed did not meet applicable building code requirements, and in this regard, relies upon admissions against interest that Moreland made in a 2002 Nevada lawsuit against its general contractor and others.  Moreland Corp. et al. v. RMA, Inc. et al., No. CV-S-02-1259-JCM -PAL (D.Nev., filed Sept. 26, 2002).  Defendant also maintains that, even if the default termination was improper, a "Termination for Convenience of the Government" clause incorporated by reference in the Lease prevents Moreland from recovering unpaid monthly rent.

The Court conducted an eight-day trial in Washington, D.C. during September 18-27, 2006.  The parties filed post-trial briefs on December 18, 2006.  Plaintiffs and Defendant filed reply briefs on January 29, 2007 and February 13, 2007 respectively.  The Court heard closing arguments on February 21, 2007.  The Court's evidentiary record consists of the testimony of nine witnesses, 288 exhibits, and 2,994 transcript pages.[2]

---

[2]  The nine trial witnesses in order of appearance were: George Szwarcman, a VA contracting officer; Kharaiti Abrol, a VA structural engineer; Anthony Principi, former Secretary of the VA; David Malone, a structural engineer; Terry Moreland, Chief Executive Officer of the Moreland Corporation; Dudley Schadeberg, a VA contracting officer; Lowell Bridwell, a real estate appraiser; Paul Wilkins, Director of the Las Vegas City Building Department; and John A. Martin, Jr., a structural engineer.

For the reasons explained below, the Court concludes that the VA's default termination was improper. Although the building was not perfectly constructed and experienced certain exterior cracks, the Court finds that the defects were largely cosmetic and easily could have been repaired if the VA had permitted Moreland to do so. Indeed, certain omitted "gusset plate" welds on lateral steel bracing could have been repaired upon being identified, but the VA did not allow Moreland to perform this work until after termination. Alleged design deficiencies concerning structural loading capacity appear to have been isolated, minor, or nonexistent. In considering the competing testimony of the structural engineers on these issues, the Court affords the greatest weight to Plaintiffs' expert, Dr. David Malone of Exponent Failure Analysis ("Exponent").[3] Based upon Dr. Malone's testimony and other evidence of record, the Court finds that the building was not unsafe for the VA's occupancy. Despite pronouncements from the VA and its consulting engineer that the building was unsafe, the VA used and occupied the building without interruption for more than five years, and remained in the building for nine months after termination.

As importantly, the Court finds that the VA breached its duty of good faith and fair dealing with Moreland. The VA initially used alleged building deficiencies in late 2000 as a pretext to have Moreland bear the expense of conducting a structural loading study that the VA would later use to add a roof-mounted air conditioning system to the building. Separately, the VA's Contracting Officer, acting upon the advice of agency counsel, denied approximately $300,000 in Moreland's construction-related claims. While the Contracting Officer thought the claims were justified and should be paid, counsel advised that the claims should be denied as a means of gaining leverage over Moreland. Furthermore, when welding omissions and exterior cracks surfaced, the VA repeatedly imposed upon Moreland the requirement for "a comprehensive plan" before it would allow Moreland to make repairs. The Lease, however, contained no such obligation, and Moreland owned the building. Even when Dr. Malone and his associates proposed a reasonable repair plan on behalf of Moreland in 2002, the VA violated the Lease by not permitting Moreland to make repairs until after the VA had terminated the Lease for default.

The Court finds that Moreland is entitled to damages for the net unpaid rent in the amount of $17,992,215.85, plus interest as allowed under the Contract Disputes Act. In the circumstances of this Lease, the "Termination for Convenience of the Government" clause does not prevent Moreland's recovery of unpaid rent. This is not a typical Government contract where an improper default is treated as a termination for convenience. Rather, the VA employed other provisions that governed during the lease term. The applicable default clause, "Default by Lessor During the Term," cited by the Contracting Officer in the default notice, does not convert an improper default termination to a termination for convenience.

---

[3] Exponent is a highly regarded structural engineering firm that the United States retained to investigate the collapse of the World Trade Center after September 11, 2001.

Moreover, before signing the agreement, the parties clearly manifested their mutual intent to delete the clause entitling the Government to terminate the Lease for convenience.

Moreland, however, is not entitled to recover the value of the building that it lost through foreclosure. The record does not support a finding that the default termination necessarily caused the foreclosure. The Court does not have before it Moreland's bank loan agreement(s), and thus cannot say whether Moreland had any recourse against the bank after the VA's default termination, whether Moreland could have refinanced the balance of the loan, or whether Moreland had the means to repay the loan balance to retain its asset. The record also does not indicate whether Moreland was entitled to any offsetting recovery from the bank upon the later sale or lease of the building. Without sufficient evidence of causation, the claim for the lost building asset must fail.

Findings of Fact[4]

A.    The Lease Agreement

On September 19, 1995, the VA and Moreland entered into Lease No. 084B-001-94 ("the Lease") for Moreland to design, construct, and lease back to the VA an Ambulatory Care Center in Las Vegas, Nevada ("the Medical Clinic"). (Exh. 1).[5] The Medical Clinic became known as the Addelair F. Guy III Ambulatory Care Center. (Stip. 1). The VA agreed to lease the Medical Clinic for a fixed term of 15 years, from March 1, 1997 through February 28, 2012. (Exh. 1, ¶ 2). The Lease contains an option for the VA to extend the term for five additional years. (Exh. 1, ¶ 5).

The Lease provides that the Medical Clinic would consist of "a two-story building containing approximately 148,260 net usable square feet of space, plus 801 parking spaces, to be constructed in accordance with specifications set forth in Solicitation for Offers No. 084B-001-94 and addenda thereto, on approximately 14.9 acres of land at the corner of Martin Luther King Boulevard and Las Vegas Drive, Las Vegas, NV." (Exh. 1, ¶ 1; Stip. 2). The Lease further provides that the United States is obligated to pay Moreland during the 15-

---

[4]   This statement of the facts constitutes the Court's principal findings of fact under RCFC 52(a). Other findings of fact and rulings on mixed questions of fact and law are set forth in the later analysis.

[5]   In this opinion, the Court will refer to the trial transcript by witness and page as "Name, Tr. __," and to the evidentiary exhibits as "Exh. __." For lengthy exhibits, a page or paragraph reference is provided where necessary. The parties agreed upon a single continuous set of exhibits, and thus no distinctions are made between Plaintiffs' exhibits and Defendant's exhibits. The parties' pretrial stipulations of fact are referred to as "Stip. __."

year term annual rent of $2,139,391.80, or $14.43 per square foot, at the rate of $178,282.65 per month.  (Exh. 1, ¶ 3; Stip. 3).  The Lease states that, of the annual rent of $14.43 per square foot, $0.82 is attributed to operating expenses, and $13.61 is the net rent.  (Exh. 1, ¶ 7; Stip. 4).

The Lease is an 831-page document consisting of multiple forms, clauses, schedules and amendments compiled by the VA.  (Exh. 1 at 2, Contents of Lease Document).  The Lease combines various requirements and specifications relating to the construction of the facility, with provisions that apply to the lease term after the VA begins its occupancy.  For example, a section entitled "General Clauses (Acquisition of Leasehold Interests in Real Property)" (GSA Form 3517), applies to the lease term.  (Exh. 1 at 259-79).  The provisions in that section use the terms "lease" and "lessor," among others, that indicate specific applicability to lease, rather than to construction issues.  Id.  Other clauses in the Lease apply to the construction phase.

The Lease contains a provision entitled "Adjustment for Vacated Premises."  This provision states:

> If the Government fails to occupy any portion of the leased premises or vacates the premises in whole or in part prior to expiration of the firm term of the lease, the rental rate shall be reduced as follows:
>
> The rate shall be reduced by that portion of the cost per square foot of operating expenses not required to maintain the space.  Said reduction shall occur after the Government gives 30 days prior notice to the lessor, and shall continue in effect until the Government occupies the premises or the lease expires or is terminated.

(Exh. 1, Solicitation For Offers, ¶ 3.19).

The first two pages of the Lease on Standard Form 2 (February 1965 edition) contain a paragraph that would have allowed the VA to terminate the Lease at any time by giving 180 days' advance notice.  This provision states:

> The Government may terminate this lease at any time by giving at least 180 days' notice in writing to the Lessor and no rental shall accrue after the effective date of termination.  Said notice shall be computed commencing with the day after the date of mailing.

(Exh. 1, ¶ 4).  However, the VA and Moreland deleted this paragraph from the Lease by lining through the entire text prior to signing.  (Szwarcman, Tr. 446-47; Moreland, Tr. 1749-

51).  The concluding paragraph on Standard Form 2, directly above the parties' signatures, states:  "The following changes were made in this lease prior to its execution: Paragraph 4 was deleted in its entirety."  (Exh. 1, ¶ 9).

Mr. Moreland explained at trial that "our bank said that they would not agree to a lease that had a termination clause in it[,]" and that the clause "was struck from the beginning, that [the VA] did not have a right to terminate the lease after the lease went into effect."  (Moreland, Tr. 1749).  He further testified that his company had invested $17,000,000 in constructing the "single-purpose building," and that it "wouldn't make good business sense" to allow the Government out of the Lease upon 180 days' notice, leaving his company "holding the bag" for the amount of the investment.  (Moreland, Tr. 1750-51).

The Lease contains a provision entitled "Maintenance of Building and Premises – Right of Entry (AUG 1992)" which states:

> Except in case of damage arising out of the willful act or negligence of a Government employee, Lessor shall maintain the premises, including the building and all equipment, fixtures, and appurtenances furnished by the Lessor under this lease, in good repair and condition so that they are suitable in appearance and capable of supplying such heat, air conditioning, light, ventilation, access and other things to the premises, without reasonably preventable or recurring disruption, as is required for the Government's access to, occupancy, possession, use and enjoyment of the premises as provided in this lease.  For the purpose of so maintaining the premises, the Lessor may at reasonable times enter the premises with the approval of the authorized Government representative in charge.

(Exh. 1, General Clauses, ¶ 14, Section 552.270-12).

The Lease contains a provision entitled "Inspection of Construction (FAR 52.246-12) (JUL 1986)" which states in part:

> (f) The Lessor shall, without charge, replace or correct work found by the Government not to conform to contract requirements, unless in the public interest the Government consents to accept the work with an appropriate adjustment in contract price.  The Lessor shall promptly segregate and remove rejected material from the premises.

> (g) If the Lessor does not promptly replace or correct rejected work, the Government may (1) by contract or otherwise, replace or correct the

work and charge the cost to the Lessor or (2) terminate for default the Lessor's right to proceed.

(h) Unless otherwise specified in the contract, the Government shall accept, as promptly as practicable after completion and inspection, all work required by the contract or that portion of the work the Contracting Officer determines can be accepted separately. Acceptance shall be final and conclusive except for latent defects, fraud, gross mistakes amounting to fraud, or the Government's rights under any warranty or guarantee.

(Exh. 1, Solicitation For Offers, ¶ D.32).

The Lease contains a provision entitled "Guaranty (VAAR 852.236-75) (APR 1984)" which provides in part:

(b) If defects of any kind should develop during the period such guarantees are in force, the contracting officer shall immediately notify the Lessor in writing of such defects. The Government thereupon shall have the right, by a written notice to that effect, to require the Lessor to repair or replace all inferior or defective work, material, or equipment or permit it to remain in place and assess the Lessor the costs he/she (the Lessor) would have incurred had he/she been required to effect repair or replacement.

* * *

(e) Should the Lessor fail to proceed promptly, after notification by the contracting officer, to repair or replace any inferior or defective work, material, or equipment, or damage to the site, buildings, or contents thereof, caused by inferior or defective work, or the use of inferior or defective materials, or equipment, the Government may have such work, material, equipment, or damage repaired or replaced and charge all costs incident thereto to the Lessor.

(Exh. 1, Solicitation For Offers, ¶ D.35).

The Lease contains a provision entitled "Warranty of Construction (FAR 52.246-21) (APR 1984)" which provides in part:

(c)  The Lessor shall remedy at the Lessor's expense any failure to conform, or any defect.  In addition, the Lessor shall remedy at the

Lessor's expense any damage to Government-owned or controlled real or personal property, when that damage is the result of –

(1) The Lessor's failure to conform to contract requirements; or

(2) Any defect of equipment, material, workmanship, or design furnished.

\* \* \*

(f) If the Lessor fails to remedy any failure, defect, or damage within a reasonable time after receipt of notice, the Government shall have the right to replace, repair, or otherwise remedy the failure, defect, or damage at the Lessor's expense.

\* \* \*

(j) This warranty shall not limit the Government's rights under the Inspection and Acceptance clause of this contract with respect to latent defects, gross mistakes, or fraud.

(Exh. 1, Solicitation For Offers, ¶ D.48).

The Lease contains a provision entitled "Failure in Performance (AUG 1992)" which states:

The covenant to pay rent and the covenant to provide any service, utility, maintenance, or repair required under this lease are interdependent. In the event of any failure by the Lessor to provide any service, utility, maintenance, repair or replacement required under this lease the Government may, by contract or otherwise, perform the requirement and deduct from any payment or payments under this lease, then or thereafter due, the resulting cost to the Government, including all administrative costs. If the Government elects to perform any such requirement, the Government and each of its contractors shall be entitled to access to any and all areas of the building, access to which is necessary to perform any such requirement, and the Lessor shall afford and facilitate such access. Alternatively, the Government may deduct from any payments under the lease, then or thereafter due, an amount which reflects the reduced value of the contract requirement not performed. No deduction from rent pursuant to this clause shall constitute a default by the Government under this lease. These

remedies are not exclusive and are in addition to any other remedies which may be available under this lease or at law.

(Exh. 1, General Clauses, ¶ 15, Section 552.270-17).

The next paragraph of the Lease, "Default by Lessor During the Term (AUG 1992)" states:

(a) Each of the following shall constitute a default by Lessor under this lease:

(1) Failure to maintain, repair, operate or service the premises as and when specified in this lease, or failure to perform any other requirement of this lease as and when required provided any such failure shall remain uncured for a period of thirty (30) days next following Lessor's receipt of notice thereof from the Contracting Officer or an authorized representative.

(2) Repeated and unexcused failure by Lessor to comply with one or more requirements of this lease shall constitute a default notwithstanding that one or all such failures shall have been timely cured pursuant to this clause.

(b) If a default occurs, the Government may, by notice to Lessor, terminate this lease for default and if so terminated, the Government shall be entitled to the damages specified in the Default in Delivery – Time Extensions clause.

(Exh. 1, General Clauses, ¶ 16, Section 552.270-33).

B.    VA Occupancy and Lease Commencement

The principal entities engaged in the design and construction of the Medical Clinic were:  Design Collaborative Southwest, Inc. ("DCSW"), the project architect; RMA, Inc., the general contractor; Design Engineering Associates of Nevada, Inc. ("DEA"), the principal engineering consultant to DCSW; Lucchesi, Galati Architects, Inc., the VA's architectural consultant; and Martin & Peltyn, the VA's design engineering consultant. (Stip. 7; Moreland, Tr. 1606-09, 1619-20).

The VA approved the design of the Medical Clinic prior to occupying the building. (Abrol, Tr. 731-32; Moreland, Tr. 1617).  Thereafter, beginning in March 1997, the VA took

occupancy of portions of the Medical Clinic, and on June 1, 1997, the VA occupied the entire building and began making payments to Moreland under the Lease. (Stip. 8). More than a month later, on July 11, 1997, the City of Las Vegas issued a temporary occupancy permit for the Medical Clinic, and a final Certificate of Occupancy on February 8, 1998. (Exh. 7; Wilkins, Tr. 2270-71; Stip. 9).

According to Mr. Paul Wilkins, Director of the Building Department for the City of Las Vegas, the Medical Clinic complied with the Uniform Building Code and City of Las Vegas Ordinances beginning in 1998 when the Certificate of Occupancy was issued. (Wilkins, Tr. 2270-72, 2301, 2312-14). Mr. Wilkins at all times thought that the Medical Clinic was safe as constructed. (Wilkins, Tr. 2312).

C.     Questionable VA Conduct Relating to Building Matters

On July 17, 2000, the VA's Contracting Officer, Dudley Schadeberg, issued final decisions denying two claims by Moreland relating to the construction of the Medical Clinic. Based upon the advice of VA counsel, Mr. Schadeberg denied Moreland's claims for extended supervision and labor costs, despite his conclusion that Moreland was entitled to approximately $300,000. Mr. Schadeberg had prepared a draft final decision allowing the added labor cost claim on the merits. (Exh. 12). He testified that he also would have allowed the extended supervision cost claim. (Schadeberg, Tr. 2209). VA Counsel advised Mr. Schadeberg, however, that the VA would use the denial of the claims as leverage in trying to settle other disputed claims. (Exh. 11, 13; Schadeberg, Tr. 2209-10, 2236).

Separately, on June 30, 1999, the VA's Office of Inspector General ("OIG") issued a report on its Combined Assessment Program Review of the Southern Nevada Veterans Healthcare System. (Exh. 10). The OIG reported on the discovery of certain "deficiencies" at the Medical Center that "prevented the activation" of the Surgery Suite. Id. at 17. The OIG noted that the VA "was responsible for correcting the deficiencies because the accepted construction work had been substantially in compliance with contract specifications." Id. at 18.

Kharaiti Abrol served as the Principal Structural Engineering Consultant to the VA. (Exh. 17 at 3). In November 2000, the VA instructed Mr. Abrol to conduct a "limited structural study" of the Medical Clinic, and report his findings. (Exh. 17, 18). On December 13, 2000, Mr. Abrol issued a two-page memorandum listing structural concerns with the Medical Clinic. (Exh. 17 at 2-3). On December 19, 2000, Mr. Schadeberg forwarded a copy of Mr. Abrol's report to Grant Richardson, the VA's Southern Nevada Healthcare System Facility Manager. (Exh. 17 at 1). Mr. Schadeberg's transmittal letter notes that Mr. Abrol's report "should provide the necessary justification for you to request that the Lessor, Moreland Corporation, contract for and have conducted a comprehensive structural study of the

[Medical Clinic], at no cost to the Government." Id. Mr. Schadeberg testified that he asked Mr. Abrol to prepare the report because he wanted Moreland to pay for a comprehensive study. (Schadeberg, Tr. 2214-15). On January 9, 2001, the VA issued such a demand on Moreland. Citing the "structural deficiencies" identified in Mr. Abrol's report, Contracting Officer David Goodman informed Terry Moreland that the VA "now requests that Moreland, at its own expense, conduct a comprehensive independent structural study" of the Medical Clinic. (Exh. 18 at 1; Stip. 10).

Moreland requested DCSW, the project architect, and DEA, the principal engineering consultant, to review Mr. Abrol's report. DCSW and DEA informed Moreland that they disagreed with Mr. Abrol's findings and conclusions. (Exh. 22, 24; Moreland, Tr. 1654-60). Moreland provided to the VA the DCSW and DEA response to the Abrol report, and indicated that Moreland would not conduct the comprehensive structural study requested by the VA. (Moreland, Tr. 1660, 1662-63).

D.    Discovery of Building Defects

On May 24, 2001, the VA retained the services of John A. Martin & Associates, Inc. ("JAMA"), a professional engineering firm, to conduct a structural analysis of the Medical Clinic, and to "[p]rovide [a] solution to any problem" and "[p]rovide an estimate of cost to remove and/or correct deficiencies." (Stip. 12; Exh. 125, 258).

In January 2002, Moreland attempted to correct certain cracks on a concrete column on the exterior of the Medical Clinic, which DEA and Moreland attributed to thermal expansion and contraction of the precast panels. (Exh. 51; Moreland, Tr. 1671-73). The VA prevented Moreland from making the repairs pending review and approval by JAMA. (Exh. 83).

JAMA issued a preliminary report to the VA in March 2002, identifying potential structural issues that required further analysis. (Stip. 13; Exh. 56, 70, 88; Martin, Tr. 2965). In this preliminary report, JAMA stated in part:

> As we have indicated to your office, we are concerned about the overall structural capacity and stability of the building. While we do not believe that this is a matter for immediate evacuation, we do believe there are many structural issues that must be addressed . . . . We recommend these concerns be addressed and resolved in the next six months. We have also indicated to your office that we do not believe the building could be occupied during any remedial action taken to upgrade any deficient areas. We also do not believe that any work, of

> any kind, should be done at the facility without a comprehensive approved plan.

(Exh. 70 at 5-6).   JAMA's recommended six-month time period to repair structural deficiencies was not related to any immediate safety concerns, but was arbitrarily set to encourage the VA not to "sit" on the issue.  (Martin, Tr. 2818, 2873-74).

On March 26, 2002, the VA issued a Cure Notice to Moreland stating in part:

> This letter is to notify you that the Las Vegas [Medical Clinic] has numerous structural deficiencies as identified in the report prepared by *John A. Martin & Associates, Inc. Structural Engineers* (Martin) that affect the safety of VA employees and patients.  The report, dated March 2002, is enclosed for your reference and action.
>
>      * * *
>
> Please provide to this office by close of business April 4, 2002, a written statement declaring whether you intend to remedy all of the deficiencies noted in the Martin report, a tentative timeline for completion of the remedial repairs, and a statement that you will reimburse VA for all expenses incurred as a result of these deficiencies. Further, by close of business April 15, 2002, please provide this office with the proposed repairs for each deficiency noted in the Martin report.

(Stip. 14, 15; Exh. 70) (emphasis in original).

In March 2002, the VA began exploring options to move its clinical operations from the Medical Clinic to other locations in the Las Vegas area.  (Exh. 59, 60, 61, 62, 66, 68, 74). In considering various options, VA Secretary Anthony Principi contacted the Secretary of the Air Force to inquire about locating an outpatient clinic at Nellis Air Force Base, northeast of Las Vegas.  (Principi, Tr. 926-27).

In an April 4, 2002 letter to the VA, Moreland responded to the Cure Notice, stating in part:

> In summary, LVVA[6] will conduct an initial investigation of Martin's allegations but cannot fully respond to them, much less engage in a

---

     6  "LVVA" refers to "Las Vegas VA1 LLC," the co-plaintiff in this action.  LVVA is the owner of the real property on which the Medical Clinic is located.

comprehensive investigation, until such time as Martin completes and documents its charges.  Please provide us with a copy of Martin's final report when it becomes available.  Even if Martin does not provide a final report, LVVA will immediately retain an expert and have it conduct an independent investigation to determine the validity of Martin's alleged defects.  We can discuss the timing of the disclosure of reports and remedial plans once additional information is obtained.

(Stip. 16; Exh. 87 at 7).

On April 12, 2002, representatives of the VA, JAMA, Moreland, DEA, and DCSW met at the Medical Clinic to discuss JAMA's March 2002 report.  At this meeting, JAMA's Mr. Martin indicated that the report was based "solely on information at [JAMA's] disposal," and that he had not had the benefit of input from DEA and other critical information.  Mr. Martin stated that he would issue a supplemental report after he received pertinent information and materials from Moreland.  (Exh. 88 at 2; Moreland, Tr. 1680-84; Stip. 17).  In a follow-up letter dated April 19, 2002, the VA's General Counsel stated to Moreland's Las Vegas counsel that "[i]n no event, however, will any remediation be undertaken until the Martin report, as supplemented, is presented to VA with VA then determining the most appropriate course of action."  (Exh. 88).

JAMA and Mr. Martin determined in April 2002 that the alleged structural deficiencies at the Medical Clinic were not as serious as originally thought.  (Exh. 83, 89). The VA Secretary's Chief of Staff, Chris Yoder, reported to Secretary Principi on April 19, 2002:

According to our consultant (Martin) initial fears that the building is unsafe and should be expidiciously [sic] evacuated are no longer supported by the evidence.  The building has structural defects and must be expiditiously [sic] repaired – but there is less life-safety-driven urgency than we had feared.

(Exh. 89 at 2; Principi, Tr. 942).

In April 2002, Moreland attempted to repair a missing gusset plate weld in the dental area of the Medical Clinic, and a missing "embed" in an exterior panel in the patio area, but the VA prevented Moreland from correcting those deficiencies pending JAMA's review and approval.  (Exh. 138).

On May 28, 2002, JAMA issued a supplement to its March 2002 report, identifying three primary areas of concern that required further analysis: (1) precast panels; (2) steel

-13-

columns; and (3) lateral bracing.  (Martin, Tr. 2894).  In its supplemental report, JAMA stated in part:

> As we have indicated to your office we have concern for the overall structural capacity of the building.  As we have previously stated, we do not believe that this is a matter for immediate evacuation; we do believe there are many structural issues that must be addressed.  If this structure were not occupied, we would recommend that it not be occupied until the structural issues have been resolved.   Our calculations indicate and we believe that the structure, as constructed, did not structurally meet the minimum standards required by code.
>
>     \* \* \*
>
> We do not believe that the entire structure is an immediately life safety hazard.   If there were to be a code level earthquake, or severe windstorm, we would expect local portions of the building to perform very poorly, with partial collapse being possible.
>
> We wish to emphasize again that we do not believe that any work, of any kind, should be done at the facility without a comprehensive plan.

(Stip. 18; Exh. 113 at 2).

      E.     <u>Events Culminating in Default Termination</u>

On June 7, 2002, due in substantial part to JAMA's supplemental report, the VA issued a Show Cause Notice to Moreland stating that the VA was considering terminating the Lease for default based upon the VA's allegation that the Medical Clinic did not meet the minimum structural building code requirements.  (Stip. 19; Exh. 125; Szwarcman, Tr. 133-34).  On June 17, 2002, Moreland responded to the Show Cause Notice stating in part that it had "every intention of fixing structural defects that . . . are shown to be the product of work performed by contractors hired to build the facility."  (Exh. 131; Stip. 20).  Moreland also proposed a meeting to discuss the structural issues and to set "an appropriate timetable" for resolution of the issues.  (Exh. 131 at 6).

Three days later, on June 20, 2002, VA officials recommended to Secretary Principi that the Lease be terminated for default, and that the Medical Clinic be relocated to new space.  (Exh. 137 at 2; Principi, Tr. 940-41).

On June 21, 2002, the VA issued a letter to Moreland stating in part:

-14-

This is to notify you that it is VA's position that the [Medical Clinic] has significant structural defects and does not meet the building code standards required by the provisions of the lease.  This conclusion is based on the reports provided VA by its consultant, John A. Martin & Associates (JAMA), Structural Engineers.  JAMA further advises that proper remediation cannot safely be performed while the facility is occupied nor can VA operate a medical facility in which such extensive structural remediation is being performed.

Consequently, VA intends to vacate the facility in an orderly fashion as soon as it is reasonably practicable.  At that time, VA will cease making lease payments under the current lease.

* * *

VA intends to move back to [the Medical Clinic] provided all structural deficiencies are corrected and the building is brought up to code and meets all other lease provisions, all within a reasonable time.  Please note, however, that if the required remediation to the building is not comprehensive and completed within a reasonable time, VA will terminate this lease for Default and seek an alternate permanent facility.

(Stip. 21; Exh. 140).

On July 8, 2002, Moreland and VA representatives met in Washington, D.C. to discuss the structural issues noted in the JAMA report.  (Stip. 22; Exh. 146; Szwarcman, Tr. 243-44).  At this meeting, the parties agreed that Moreland would perform a structural investigation of the Medical Clinic and remediate any identified structural deficiencies. (Exh. 150; Moreland, Tr. 1715-17).  The parties' agreement required Moreland to: (1) present a "comprehensive plan" for the inspection of the Medical Clinic by July 25, 2002; (2) conduct an inspection of the Medical Clinic after the VA approved the inspection plan; (3) submit a "detailed" remediation plan to the VA within two weeks of the inspection; and (4) submit "design documents for the remediation project" within 30 days after the VA's approval of the remediation plan.  (Exh. 150).

On July 9, 2002, Moreland retained Exponent to inspect the Medical Clinic and to design remedial work for any required repairs.  (Malone, Tr. 1096).  On July 10, 2002, Exponent's Dr. David Malone traveled to Las Vegas to begin this assignment.  (Malone, Tr. 1101).  Dr. Malone met with DEA's Dan Campbell, the structural engineer of record, reviewed drawings and building details, and conducted a site inspection.  Id.  Dr. Malone attempted to obtain information from JAMA's Mr. Martin, including engineering

calculations and analyses pertinent to the JAMA March and May 2002 reports, but JAMA did not provide this information to Dr. Malone. (Malone, Tr. 1121-23).

On July 11, 2002, representatives of Moreland, Exponent, JAMA, and the VA met in Las Vegas to prepare a plan of action and a schedule to inspect and repair, if necessary, the deficiencies identified by JAMA. (Stip. 23; Malone, Tr. 1102-1105; Moreland, Tr. 1718-19). The parties agreed to a two-pronged plan to inspect and repair the alleged structural deficiencies. (Szwarcman, Tr. 108-09; Malone, Tr. 1106). In the first stage, Exponent and Moreland would focus on the three areas deemed critical by the VA and JAMA: (1) precast panels; (2) steel columns, and (3) lateral bracing. After addressing these three issues, Exponent and Moreland would turn to the remaining issues identified in the JAMA reports, and develop a comprehensive plan for inspecting the entire facility. (Stip. 23; Exh. 154, 156; Szwarcman, Tr. 109; Malone, Tr. 1106).

Moreland's counsel sent a letter to the Contracting Officer after the July 11, 2002 meeting to confirm the agreed upon plan for investigation. (Exh. 151). This letter noted that "today's meeting was very productive under a cooperative spirit." Id. at 2. Dr. Malone testified that he, too, noted the cooperative environment at the meeting. (Malone, Tr. 1105-06). Counsel's letter requested that Moreland be provided access to the building "on Monday, July 15 and Tuesday, July 16 during non-operating hours to review interior and exterior issues associated with the precast panels which are cracked at several locations." (Exh. 151 at 2).

The Contracting Officer did not participate in the July 11, 2002 meeting, but responded to Mr. Moreland in a July 12, 2002 letter stating "VA has determined that your plan is insufficient as it does not provide sufficient detail nor a comprehensive approach to investigating all of the structural deficiencies specified in the JAMA report." (Exh. 152). The Contracting Officer's letter further stated that "you may not initiate your inspection of the [Medical Clinic] until a more detailed and comprehensive plan is provided for review and approval," and that "you may not initiate inspection on Monday, July 15." Id.

On July 17, 2002, after being denied access to the Medical Clinic, Moreland submitted to the VA a renewed request to inspect the building, reflecting the two-pronged approach the parties had discussed at the July 11, 2002 meeting. (Exh. 156). The VA approved Moreland's inspection plan on July 19, 2002, and demanded that the inspection be completed within two weeks. (Exh. 158 at 3). Exponent conducted its inspection of the Medical Clinic from July 22 to August 1, 2002. (Exh. 164; Malone, Tr. 1199).

On August 9, 2002, Exponent issued a preliminary report which Moreland's counsel sent to the VA on August 12, 2002. (Stip. 25; Exh. 166). Exponent confirmed the existence of three structural deficiencies identified in JAMA's May 2002 supplemental report relating

to the lateral bracing system, the steel columns, and the precast panels, and described detailed protocols to repair those deficiencies. (Exh. 164; Malone, Tr. 1198-1209). Exponent's plan was "comprehensive" and presented a course of action for remedying all known and potential defects at the Medical Clinic. (Malone, Tr. 1211-12, 1244-45). Exponent stated that, in the course of conducting repairs, it would "continually inspect concealed areas opened for repair for other design or construction issues." (Exh. 164 at 7). Exponent further explained:

> While we conclude that repair of certain conditions is required, as discussed below, based on our field observations, review of the design drawings and calculations, review of recent analytical work by others, and our own analyses, we conclude that none of the conditions investigated poses a threat to the continued safe occupancy of the building in the near-term.

(Exh. 164 at 1).

In August 2002, Exponent's Dr. Malone contacted Mr. Martin to discuss various engineering issues. Dr. Malone wanted to address JAMA's concerns relating to the steel columns and precast panels, and he wanted to explain Exponent's column analysis. However, due to Mr. Martin's unavailability, Dr. Malone was unable to arrange a meeting, and ultimately he resorted to mailing Exponent's column analysis to Mr. Martin on August 23, 2002. (Exh. 161; Malone, Tr. 1192-94, 1201-02).

On August 15, 2002, Moreland requested the VA's permission to repair missing gusset plate welds on the lateral bracing. Moreland requested to schedule this repair work for August 24, 2002, noting the need for at least four days' notice to mobilize its crews. (Exh. 168, 171). On August 22, 2002, the VA approved Moreland's request, leaving Moreland just two days to mobilize its crews. Additionally, the VA conditioned its approval on Moreland's execution of an Indemnification and Reimbursement agreement relating to the contemplated repair work. (Exh. 172). Moreland objected to the indemnity agreement, and postponed its repairs until receiving notice that the VA would not insist upon an indemnity provision. (Exh. 178; Moreland, Tr. 1729).

On September 3, 2002, the VA abandoned the condition that Moreland sign the indemnity agreement, and authorized Moreland to perform welding repairs during the weekend of September 7-8, 2002. (Exh. 179). Since Moreland could only access the Medical Clinic on nights and weekends, Moreland scheduled the welding repair work for September 14-15, 2002, the first weekend after the four-day notice needed to schedule a crew. (Malone, Tr. 1210; Szwarcman, Tr. 433).

On September 9, 2002, JAMA issued a letter to the VA stating as follows:

> JAMA would like to summarize our current position on the [Medical Clinic] in two statements.
>
> > 1. It is our opinion that the building, as constructed, did not and does not meet the minimum standards as set forth in the 1994 Uniform Building Code (1994 UBC). We understand that the 1994 UBC was the design code for the [Medical Clinic].
> >
> > 2. It is our opinion that the structure, as it stands, is unsafe for continued occupancy.

(Exh. 180 at 2; Stip. 27). Unlike JAMA's March 2002 preliminary report, the September 9, 2002 letter did not contain a Professional Engineer's stamp showing that Mr. Martin produced and would be professionally liable for statements made therein. (Compare Exh. 78 at 4 with Exh. 180; Malone, Tr. 1218-19).

On September 12, 2002, the VA notified Moreland that it was terminating the Lease for default and vacating the Medical Clinic. (Exh. 182; Szwarcman, Tr. 157; Stip. 28). In this seven-page letter, the Contracting Officer stated in part:

> This letter advises you that the Department of Veterans Affairs (VA) is terminating the above-referenced lease for **DEFAULT**, as the Moreland Corporation (Moreland) has failed to make satisfactory progress to repair and remediate the structural deficiencies in the building that houses the [Medical Clinic]. Further, Moreland has failed to provide VA with the oft-time-requested comprehensive remediation plan that both VA and Moreland agreed is the mandatory first step in order for Moreland to carry out its obligation to repair and remediate the structural deficiencies in the [Medical Clinic]. Moreland's failure to make satisfactory progress to remediate the deficiencies has compromised the integrity of the structure and has rendered the structure **"unsafe for continued occupancy,"** as stated emphatically by VA's structural engineering consultant, John A. Martin & Associates, Inc. (JAMA), in a September 9, 2002 letter to the VA Contracting Officer. Consequently, VA has been constructively evicted, being deprived of the beneficial enjoyment of the [Medical Clinic].
>
> > * * *
>
> Your breach of the provisions of the lease, rendering the premises unsafe for continued occupancy, warrants the Contracting Officer's

> decision to terminate this lease, having been constructively evicted
> from the [Medical Clinic], and to vacate the premises within a
> reasonable period. **See Richard Richardson v. The United States, 17
> Cl. Ct. 355 (July 11, 1989); Appeal of David Kwok, 90-1 BCA
> 22,292 (August 31, 1989).**

(Exh. 182 at 1-2; Stip. 28) (emphasis in original). As authority for issuing the default notice, the Contracting Officer cited lease clause 552.270-33, "Default by Lessor During the Term." Id. at 6.

The Contracting Officer testified that, at the time of default termination, he was not aware of the specific anticipated cost of moving the VA's clinical operations to other locations, pointing out that he was not responsible for procuring new space for the VA. (Szwarcman, Tr. 427). He learned later that the rental cost of moving the Medical Clinic operations to other locations in Las Vegas was approximately $4,000,000 more per year than the rental cost under the Lease with Moreland. Id. The VA has not claimed any of these costs against Moreland as damages or excess costs of reprocurement.

F.     Post-Termination Events

Moreland completed the repair work on the gusset plates, each of which was missing one out of seven welds, on September 14-15, 2002, and it completed finish work (sheetrocking and repainting) by September 22, 2002. (Szwarcman, Tr. 433; Moreland, Tr. 1733; Stip. 32). By certification dated December 9, 2002, Kleinfelder, Inc., an inspection firm retained by Moreland, issued a City of Las Vegas Special Inspector Final Report certifying that Moreland had successfully performed the gusset plate repairs in accordance with the approved plans, specifications, and the applicable workmanship provisions of the Uniform Building Code. (Exh. 228 at 8; Stip. 37).

On September 16, 2002, Moreland's counsel sent a letter to the VA describing a schedule for the remaining repair work concerning the steel columns and precast panels. (Exh. 184). This letter indicated that Exponent would complete its analysis and conceptual design for the steel column repairs by September 27, 2002, and that Moreland "believes this work can reasonably be completed within 30 days from finalization of the design by Exponent." (Id. at 3; Szwarcman, Tr. 437). The letter also stated that Exponent would complete the same analysis and conceptual design work for the precast panel repairs by September 27, 2002, and that Moreland "believes this work can reasonably be completed within 60 days from finalization of the design by Exponent." (Exh. 184 at 3; Stip. 33).

After termination, Moreland repeatedly requested the VA to rescind its termination and remain in the building, given that the Medical Clinic posed no life-safety threats to its

occupants, and that all outstanding repairs would be made expeditiously. (Exh. 222, 227, 234, 235, 238, 245; Moreland, Tr. 1736-37). On October 28, 2002, JAMA stated that the Medical Clinic was safe for occupancy during the work week while Moreland performed repairs on nights and weekends. (Exh. 218 at 2; Martin, Tr. 2958-59). Moreland completed the repairs to the steel columns by November 30, 2002, and the repairs to the precast panels by December 7, 2002. (Exh. 230 at 4; Malone, Tr. 1226; Stip. 36).

On June 30, 2003, the VA moved out of the Medical Clinic and terminated all rent payments as of that date. (Exh. 248; Moreland, Tr. 1744-45; Stip. 39).

On September 26, 2002, Moreland filed suit against its general contractor, RMA, Inc., and others in the U.S. District Court for the District of Nevada. Moreland Corp. et al. v. RMA, Inc. et al., No. CV-S-02-1259-JCM -PAL (D.Nev., filed Sept. 26, 2002). (Exh. 285). Among the named defendants were: Steel Encounters, Inc. ("SEI"), Boman & Kemp Steel & Supply Company ("B&K"), CNA Insurance ("CNA"), and Royal Insurance Company of America ("Royal"). Id. According to the Complaint, SEI was RMA's steel erection subcontractor, B&K was a structural steel supplier, CNA provided general liability insurance to RMA, and Royal provided general liability insurance to SEI. Id. Moreland alleged that the defendants failed in their obligations to remediate deficiencies in the Medical Clinic, asserting legal theories of breach of contract, breach of warranty, and breach of an implied covenant of good faith and fair dealing. Id. Moreland also alleged that, if the VA's default termination of the Lease were upheld, the defendants would be liable to Moreland for damages caused by the default termination. Id. The parties settled this case by payment to Moreland of $1,100,000 in October 2003. (Exh. 286).

G.    Expert Testimony

Dr. David W. Malone testified as an expert witness for Moreland. Dr. Malone has a Bachelor's Degree in Civil Engineering, a Master's Degree in Structural Engineering and Structural Mechanics from the University of California at Berkeley, and a PhD in Civil Engineering from the Massachusetts Institute of Technology. (Malone, Tr. 1091-92). He is a licensed professional engineer in the states of Washington and Maryland. (Malone, Tr. 1093-94). He has investigated "dozens" of building failures during his professional career. (Malone, Tr. 1096).

After Moreland's counsel retained Dr. Malone on July 9, 2002, Dr. Malone and his colleagues at Exponent immediately began an examination of the Medical Clinic, focusing first on the three areas of concern to the VA and JAMA: (1) exterior cracking and spalling on the second floor exterior wall panels; (2) missing welds on gusset plates used to connect diagonal braces to the steel beams and columns of the building; and (3) allegations that the columns were overstressed or under-designed. (Malone, Tr. 1096-1101; Exh. 164). Dr.

Malone determined early that this project "was certainly the kind of thing that I'd done before, and I was ready to look into it further." (Malone, Tr. 1098).

Dr. Malone is trained to examine a building with "a forensic eye." (Malone, Tr. 1116). He looks for evidence that an untrained observer may not notice, such as signs of movement or distress in a building. Id. Such evidence might include for example an area that has been patched, cracking in walls or concrete, or indications of leaks. Id. The evidence varies depending upon whether the structure is steel, concrete, or wooden. Id.

Dr. Malone examined each of the 60 exterior wall panels on the second floor of the Medical Clinic. (Malone, Tr. 1127). The concrete panels were approximately 27 feet wide, ten or eleven feet tall, and six inches thick, weighing 25,000 pounds each. (Malone, Tr. 1133, 1136-37). Dr. Malone observed the existence of cracks in the wall panels, some of them severe, and noted "to the untrained eye, this would look very alarming." (Malone, Tr. 1129; Exh. 259, photo 15). From the inside of the building, Dr. Malone and his staff examined how each panel was fastened to the steel structure. (Malone, Tr. 1135-36). Each panel was fastened to a steel beam at three locations, and a "kicker brace" was utilized at the lower portion of the panel to provide added stability. Id. Dr. Malone found that the bolts securing the kicker braces were loose in some cases, but that the fasteners bearing the vertical weight of the panel were secure. (Malone, Tr. 1159-61; Exh. 164 at 6). Dr. Malone described that tightening the kicker brace bolts was a "maintenance item," and simple to accomplish. (Malone, Tr. 1159).

The concrete wall panels were not structural elements of the building. (Malone, Tr. 1137). The cracks in the panels were purely cosmetic, and were caused by the wall panels rubbing against or resting on architectural column covers below. (Malone, Tr. 1138-39). The architectural covers also are non-structural members, and are placed around the structural steel columns to enhance the building's appearance, and to keep water away from the steel columns. (Malone, Tr. 1130-31). Dr. Malone opined that the architectural covers should not have been installed until the concrete wall panels had been braced and released. (Malone, Tr. 1139). Concrete has a tendency to settle or "creep" by fractions of an inch after being released. Id. In this case, the concrete wall panels made contact with the architectural column covers and caused the cracking. (Malone, Tr. 1140). However, because the architectural column covers are not designed to carry any load, Dr. Malone did not regard any of the cracking as a structural concern or a life-safety issue. (Malone, Tr. 1140; Exh. 164 at 6). Most of the repair work on the panels could be performed from the exterior of the building without disrupting the VA's normal operations in the building. (Exh. 164 at 6).

The general contractor employed gusset plates to attach diagonal structural bracing to steel columns and beams. (Malone, Tr. 1167). On each gusset plate, there were seven welds. (Malone, Tr. 1178). Each gusset plate was welded to a diagonal member in the shop,

and delivered to the construction site already in place.  (Malone, Tr. 1174).  Once at the site, each gusset plate was to have additional welds applied to secure the diagonal bracing to the column and beam.  (Malone, Tr. 1174, 1178; Exh. 164 at 10).

Dr. Malone found that one vertical weld had been omitted on 34 gusset plates on the second floor.  (Malone, Tr. 1167-69) (See also Exh. 259, photo 1).  Dr. Malone concluded that these gusset plate welds should be repaired, but that the absence of one of the seven gusset plate welds in these 34 cases was not of serious concern.  (Malone, Tr. 1173, 1179; Exh. 164 at 2).  Dr. Malone testified that:

> [T]his missing weld doesn't mean there's no welding on that gusset plate, because there is.  The missing weld there does not mean that this lateral bracing system is not functioning.  It is.  But the missing weld does two things.  It causes the joint connection to be a little eccentric, and it causes it to be a little more flexible than it would otherwise.  It's still functioning.  Safety is not a risk for the building to collapse.

(Malone, Tr. 1173).  Dr. Malone proposed that Moreland inspect and repair the gusset plate welds by using up to six crews over a weekend, or two consecutive weekends.  (Exh. 164 at 3-4).

Dr. Malone and his staff performed an analysis of the column stresses in the building.  (Malone, Tr. 1125, 1183-1206; Exh. 164 at 4-5, 11).  Initially, Dr. Malone visited Chavez-Grieves, an architectural firm retained by one of the insurance carriers in Albuquerque, New Mexico, and reviewed that firm's column stress data.  (Malone, Tr. 1124-25).  Dr. Malone also attempted to review column stress data prepared by the VA's consultant, JAMA, but Dr. Malone was not given access to such data until the weekend prior to trial.  (Malone, Tr. 1181).

The Medical Clinic facility was designed using hand calculations.  (Malone, Tr. 1186).  In reviewing the adequacy of the column design, Chavez-Grieves, JAMA, and Exponent used relatively comprehensive computer models that became available later for such purposes.  (Malone, Tr. 1195).  In determining whether a column's load-bearing capacity meets building code requirements, a rating of 1.0 or less is considered satisfactory, or "code compliant."  Id.  A rating slightly above 1.0 also might be acceptable in some cases.  A rating of 1.10, for example, means that the actual demand under the analytical conditions is 10 percent more than the code-specified capacity.  (Malone, Tr. 1196).  In Dr. Malone's experience, some engineers would accept a rating of 1.10 or 1.20, even though such ratings technically would fail to satisfy code requirements.  Id.  Ratings above 1.20 generally would not be acceptable.  Id.

Dr. Malone found that Chavez-Grieves used conservative default parameters in its computer analysis, which produced results indicating that some of the columns would be overstressed if loaded eccentrically and asymmetrically. (Exh. 164 at 4). Dr. Malone stated that the overstress condition reported by Chavez-Grieves "is an artifact of simplified modeling assumptions programmed into the computer, and using inappropriate or incorrect code specified coefficients in the column combined stress calculations." Id. Based upon Exponent's analysis of columns where the reported degree of overstress was high, Dr. Malone concluded that any problem was "of marginal non-compliance with the code, and not a life-safety issue." Id.

When Dr. Malone was able to review Mr. Martin's analysis of the building's structural condition, Dr. Malone was surprised to learn that JAMA found only seven of 107 structural members (columns, beams, braces) examined to be overstressed. (Malone, Tr. 1185-86; Exh. 58 at JAMA 00493-JAMA 00501). Dr. Malone did not understand how Mr. Martin could find the building "unsafe for continued occupancy" as he had stated on September 9, 2002 (Exh. 180), when Mr. Martin himself had identified such a small number of allegedly overstressed members earlier that year. (Malone, Tr. 1186).

Dr. Malone's analysis revealed that only one column in the building exceeded a stress rating of 1.10. (Exh. 164 at 11). Dr. Malone therefore concluded that the building was not in any structural danger, but that out of utmost caution, some isolated repairs could be made. (Malone, Tr. 1204-05). Of approximately 300 columns in the building, Dr. Malone recommended a "sistering" repair procedure for nine columns, and "filling" 30 other columns with high-strength cable grout. (Malone, Tr. 1203-04).

Dr. Malone summarized Exponent's work on the Medical Clinic project in three reports dated August 9, 2002, December 9, 2002, and January 17, 2003. (Exh. 164, 230, 236). In the final report, dated January 17, 2003, Dr. Malone observed that:

> Some of JAMA's concerns had been based on the assumption of 100 pounds per square foot (psf) corridor loadings, whereas the contract specified 60 psf. This resolved some of the beam and joist overload concerns.

(Exh. 236 at 1). Dr. Malone concluded by stating that "[i]t has always been [Exponent's] position that some of the issues raised needed to be remedied, but those conditions were never life-threatening." Id. at 3.

Two other structural engineers testified at trial: the VA's Kharaiti Abrol and the VA's consultant, John A. Martin of JAMA. Mr. Abrol spent only limited time reviewing structural design issues, and his only work product was a two-page memorandum dated December 13,

2000. (Abrol, Tr. 742-43; Exh. 16). The Court declines to give any weight to Mr. Abrol's memorandum because of the VA's ulterior motive in having this document prepared. The VA used Mr. Abrol's memorandum as a pretext to have Moreland perform a structural analysis at no cost to the VA. (Exh. 17). The Contracting Officer did not rely upon Mr. Abrol's analysis in the default termination notice. (Exh. 182).

The Court finds that Mr. Martin's testimony, as well as his contemporaneous correspondence and records created during the project, are largely consistent with Dr. Malone's assessment of the Medical Clinic. A significant inconsistency, however, is Mr. Martin's September 9, 2002 statement that the building "is unsafe for continued occupancy." (Exh. 180 at 2). This statement precipitated the Contracting Officer's default termination of the Lease, yet Mr. Martin reversed his position on October 28, 2002, stating that the Medical Clinic again was safe for occupancy. (Exh. 218 at 2). Mr. Martin did not explain how the building suddenly was "unsafe" on September 9, 2002, but "safe" at all other times. The Court found Mr. Martin generally to be a competent structural engineer, but suspects that some of his professionalism may have been compromised to satisfy the desires of his client, the VA. Mr. Martin also had a conflict of interest because of his association with Martin & Peltyn, the firm retained by the VA to perform structural analyses in other Las Vegas buildings where the VA might relocate. (Martin, Tr. 2890, 2907). The Court therefore does not accord Mr. Martin's testimony the same weight as Dr. Malone's.

H.   Moreland's Damages Claim

Moreland submitted a certified claim to the Contracting Officer on June 9, 2006 for the net unpaid rent for the balance of the VA's lease term. (Exh. 263). Moreland calculated the net unpaid rent by multiplying the net useable square feet (148,260) by the net annual rent per square foot ($13.61). Id. Moreland then converted this amount to an amount per month and multiplied that figure by the number of months remaining on the lease after June 30, 2003. Id. Moreland's total claim was $17,824,064.30, although it appears to have miscounted the number of remaining months, using 106 instead of 107. (Exh. 282). The Contracting Officer denied the claim on July 25, 2006. (Exh. 265).

At trial, Moreland also presented evidence of the value of the building which it lost through foreclosure. The claimed value of that lost asset is $20,000,000, based upon a November 9, 2005 appraisal by Bridwell & Company. (Exh. 2; Bridwell, Tr. 2246-51). The Court finds that the appraisal is reasonable, but that Moreland did not present evidence of causation. The notice of commencement of foreclosure proceedings is dated November 4, 2003, more than a year after the default termination. (Exh. 251). The record does not indicate whether Moreland had opportunities during this time to sell, refinance, or re-rent the facility, or whether it had the means to repay its bank loan to retain the facility. Moreland did not include this damages item in the certified claim to the Contracting Officer. In view

of the Court's disposition of this item, the Court need not address whether Moreland failed to submit this claim to the Contracting Officer for a final decision.

Discussion

A.    Burden of Proof and Applicable Standards

Under the Contract Disputes Act, the Court conducts a *de novo* review of a contracting officer's default termination. 41 U.S.C. § 609(a)(3); Seaboard Lumber Co. v. United States, 903 F.2d 1560, 1562 (Fed. Cir. 1990). When a contractor challenges a default termination of its contract, the Government bears the burden of proof to show the propriety of the termination. See Lisbon Contractors, Inc. v. United States, 828 F.2d 759, 765 (Fed. Cir. 1987). See also Aptus Co. v. United States, 61 Fed. Cl. 638, 646 (2004) ("When a contractor challenges the government's default termination of his contract, the government bears the burden of proof as to the propriety of said termination."). The Government therefore must establish by a preponderance of the evidence that the default termination was justified. Id. These principles apply with equal force where the Government has terminated a lease. See, e.g., Oscar Narvaez Venegas, ASBCA No. 49291, 98-1 BCA ¶ 29,690 at 147,142 (Where Government relies upon constructive eviction to justify its termination of a lease, it bears the burden to prove that the living or operating conditions were so "egregious" as to constitute "substantial interference with the tenant's beneficial use and enjoyment of the leased premises.").

Default termination is a "drastic sanction" and should be imposed or sustained on review only on the basis of "solid evidence." J.D. Hedin Constr. Co. v. United States, 187 Ct. Cl. 45, 57, 408 F.2d 424, 431 (1969) (citing Schlesinger v. United States, 182 Ct. Cl. 571, 584, 390 F.2d 702, 709 (1968)). When considering a default termination, the contracting officer is obligated to apply reasonable discretion. See Federal Acquisition Regulation ("FAR") § 49.402-3, "Procedure for default;" see also McDonnell Douglas Corp. v. United States, 182 F.3d 1319, 1325-26 (Fed. Cir. 1999), and cases cited therein. Thus, where the Government proves that a default exists, such occurrence grants the contracting officer the *right* to terminate for default if in the best interests of the Government, but it does not *require* that a default termination be issued. See Darwin Constr. Co. v. United States, 811 F.2d 593, 598 (Fed. Cir. 1987); Schlesinger, 390 F.2d at 706-07. Moreover, where a contracting officer in his or her discretion terminates a contract for default, the decision to terminate must be "honestly rendered." If, however, the decision to terminate is "arbitrary or capricious, or rendered in bad faith, the courts have power to review it and set it aside." Darwin Constr. Co., 811 F.2d at 598.

-25-

B.     Moreland Was Not in Default of Any Lease Provisions.

As the record indicates, there were three categories of deficiencies that concerned the VA at the Medical Clinic: (1) the missing gusset plate welds on the second-floor lateral bracing; (2) exterior cracking on the precast panels, and on architectural covers around steel columns; and (3) the overstress, or under-design, of the structural steel columns.  The parties were not aware of these deficiencies at the time Moreland completed construction, or when the VA began occupying the building.  Mr. Wilkins, on behalf of the City of Las Vegas, issued a temporary occupancy permit for the Medical Clinic on July 11, 1997, and a Certificate of Occupancy on February 8, 1998, without knowledge of these deficiencies. Accordingly, the initial step in the Court's analysis is to determine which Lease clauses apply to these three categories of deficiencies.

The described deficiencies most closely fit the definition of "latent defects."  The FAR defines "latent defect" to mean "a defect that exists at the time of acceptance but [which] cannot be discovered by a reasonable inspection."  FAR § 2.101.  Certainly, upon performing their reasonable inspections of the building at completion of construction, the parties were unaware of these deficiencies.  The VA and Moreland began the lease term in 1997 without any knowledge that these problems existed.  The parties did not become aware of the deficiencies until well into the lease term, in early 2002.

Although the missing gusset plate welds probably could have been identified by trained inspectors specifically looking for them, the fact is that the parties were not aware of these omissions at the completion of construction.  The structural loading capacity of the steel columns could have been evaluated at any time, but apparently that was not a concern until sometime after completion of the building.  The loading capacity presents a "theoretical" issue involving calculations by structural engineers.  None of the Medical Clinic's steel columns exhibited any actual stress or buckling during the VA's occupancy. The cracks in the precast panels were not observed until at least four years after the VA's occupancy.

The VA's remedies for latent defects are contained in the "Warranty of Construction" clause, FAR ¶ 52.246-21.  (Exh. 1, Solicitation For Offers, ¶ D.48).  The VA also could rely upon the "Guaranty" clause, VAAR ¶ 852.236-75.  Id. ¶ D.35.  In addition, the "Inspection of Construction" clause, FAR ¶ 52.246-12, provides that "[a]cceptance shall be final and conclusive except for latent defects."  Id. ¶ D.32, subparagraph (h).  The warranties of construction generally apply for one year, beginning at the time of acceptance or occupancy. FAR ¶ 52.246-21(b).  However, the one-year warranty is not applicable to latent defects discovered after acceptance.  Id. subparagraph (j).  Under these provisions, Moreland is responsible for the repair of latent defects whenever they are identified.

The "Warranty of Construction" clause, FAR ¶ 52.246-21 (APR 1984), affords the VA two alternative remedies when latent defects are discovered. First, upon notice from the VA, Moreland was required to repair the defects at its own expense. Subparagraph (c) of the clause provides that "[t]he Lessor shall remedy at the Lessor's expense any failure to conform, or any defect." Second, if Moreland failed to repair the defects within a reasonable time after receipt of notice, the VA could arrange for the repair of any defects itself, at Moreland's expense. Subparagraph (f) of the clause states that "[i]f the Lessor fails to remedy any failure, defect, or damage within a reasonable time after receipt of notice, the Government shall have the right to replace, repair, or otherwise remedy the failure, defect, or damage at the Lessor's expense."

The "Guaranty" clause, VAAR ¶ 852.236-75 (APR 1984), contains the same two remedies described above, but adds a third remedy, by which the VA may permit the defective work to remain, and assess Moreland the costs that would have been incurred in making the repairs. Subparagraph (b) provides that the Government may "permit [the inferior or defective work] to remain in place and assess the Lessor the costs [Lessor] would have incurred had [Lessor] been required to effect repair or replacement."[7]

Most importantly, the above provisions *do not afford the VA the right to terminate the Lease for default.* Instead, the Lease continues in effect, with clear procedures in place governing the repair or replacement of defective work. The Lessor, Moreland, remains responsible for the cost of the repairs, but is not subject to default termination. To have a basis for default termination, the Government must show a constructive eviction. Richardson v. United States, 17 Cl. Ct. 355, 357 (1989) (To establish a constructive eviction, the Government must show that acts or omissions of the landlord "substantially interfered with the beneficial use or enjoyment of the premises[.]"); David Kwok, GSBCA No. 7933, 90-1 BCA ¶ 22,292, (Common law principle of constructive eviction applies where the landlord has either "rendered the leased premises unfit for the purpose leased" or "deprived the tenant of the beneficial enjoyment of the premises.") aff'd 918 F.2d 187 (Fed. Cir. 1990) (Table).[8]

In contrast, the "Inspection of Construction" clause in the Lease, FAR ¶ 52.246-12 (JUL 1986), applicable to *pre-acceptance* inspections of construction, does contain a default remedy. (Exh. 1, Solicitation For Offers, ¶ D.32). Subsection (g) of that clause states that

---

[7] The "Failure in Performance (AUG 1992)" clause, General Clauses, ¶ 15, Section 552.270-17, permits the Government to deduct from rent any costs for maintenance or repairs that it incurs when such costs are the responsibility of the Lessor.

[8] The Contracting Officer cited the Richardson and Kwok decisions in his default termination notice, but failed to acknowledge that the facts presented here failed even to approach a "constructive eviction." (Exh. 182 at 2).

"[i]f the Lessor does not promptly replace or correct rejected work, the Government may (1) by contract or otherwise, replace or correct the work and charge the cost to the Lessor or (2) *terminate for default the Lessor's right to proceed*." (Emphasis added). The existence of the default remedy in the pre-acceptance Inspection clause, contrasted with the omission of the default remedy in the post-acceptance Warranty and Guaranty clauses, provides a clear road map of the VA's remedies. The VA could not terminate Moreland's Lease unless it established a constructive eviction, or a substantial interference with the beneficial use or enjoyment of the premises. Moreland was not in default of the Lease due to the discovery of latent defects.

The parties have discussed in their briefs the potential application of the "Maintenance of Building and Premises – Right of Entry (AUG 1992)" clause, General Clauses, ¶ 14, Section 552.270-12, but the Court finds that this clause does not apply to the repair of latent defects. This clause applies to the Lessor's duty to keep the facility "in good repair and condition," and "capable of supplying . . . heat, air conditioning, light, [and] ventilation[.]" Id. The term "building maintenance" is separate and distinct from "repairs" concerning construction deficiencies.

> C.     Moreland Did Not Cause a Constructive Eviction or Interfere
>        With the VA's Beneficial Use or Enjoyment of the Premises.

The Contracting Officer asserted in the default termination notice that the Medical Clinic was "unsafe for continued occupancy," that the VA "has been constructively evicted," and "deprived of the beneficial enjoyment" of the facility. (Exh. 182 at 1). These assertions, however, are not supported by the record. Preliminarily, the Court notes that the VA's use and occupancy of the Medical Clinic never was impacted or interrupted during the lease term, and that the VA remained in the Medical Clinic for a full nine months, until June 30, 2003, following the default termination. (Exh. 248; Stip. 39). Indeed, Defendant's counsel conceded during trial that the VA always was able to conduct its business in a normal fashion:

> There isn't and has never been a contention by the VA or the
> government in this case that the VA was prevented from conducting its
> business in a general fashion during the time between discovery of the
> structural defects and the termination.

(Smith, Tr. 1074). The Contracting Officer also conceded that the VA was able to use the facility at all times. (Szwarcman, Tr. 183).

Only one document from a structural engineer asserts that the Medical Clinic ever was unsafe for occupancy. (Exh. 180). In this document, JAMA's Mr. Martin reported to the

Contracting Officer on September 9, 2002 that "the structure, as it now stands, is unsafe for continued occupancy." Id. at 2. There are many indications in the record that Mr. Martin's assertion is incorrect and unreliable. Mr. Martin himself issued other pronouncements during his Medical Clinic work in 2001-2003 to the effect that the building did not present a safety concern. In a March 2002 preliminary report, identifying nine potential structural issues, Mr. Martin stated "we do not believe that this is a matter for immediate evacuation." (Exh. 70 at 5). In a May 28, 2002 supplemental report, Mr. Martin repeated "we do not believe that this is a matter for immediate evacuation," and added "[w]e do not believe that the entire structure is an immediate life safety hazard." (Exh. 113 at 2). On October 28, 2002, approximately six weeks after termination, Mr. Martin stated that the Medical Clinic was safe for occupancy, provided certain precautions were taken during repairs. (Exh. 218 at 2). There is nothing to explain why Mr. Martin thought the Medical Clinic was "unsafe" on September 9, 2002, but "safe" at all other times.

Moreland's structural expert, Dr. Malone, provided convincing evidence that the three categories of deficiencies did not represent serious structural defects. Dr. Malone stated in an August 9, 2002 preliminary report that "none of the conditions investigated poses a threat to the continued safe occupancy of the building in the near-term." (Exh. 166 at 3). He carefully explained in his trial testimony that each of the three deficiencies ought to be repaired, but that none of them was a life safety issue. (Malone, Tr. 1173, 1202-09). Dr. Malone reiterated in his final report, dated January 17, 2003, that "[i]t has always been [Exponent's] position that some of the issues raised needed to be remedied, but those conditions were never life-threatening." (Exh. 236 at 3).

Other evidence also casts doubt on Mr. Martin's September 9, 2002 statement that the Medical Clinic was unsafe for occupancy. Unlike the March 2002 preliminary report, Mr. Martin's September 9, 2002 letter did not contain a Professional Engineer's stamp. (Exh. 78, 180; Malone, Tr. 1219). Further, one of Mr. Martin's affiliate companies, Martin & Peltyn, had a contract with the VA to perform structural analyses in other Las Vegas buildings where the VA might relocate. (Martin, Tr. 2890, 2906-07). If Mr. Martin could encourage the VA to terminate the Moreland lease, Martin & Peltyn would realize additional business – an obvious conflict of interest.

Confronted with conflicting evidence and a sudden reversal of Mr. Martin's position, prudence would have dictated that the Contracting Officer carefully review all of the circumstances before terminating the Lease. The Contracting Officer had not visited the Medical Clinic himself in connection with the alleged deficiencies. (Szwarcman, Tr. 112). He might have inquired why Mr. Martin had changed his position. He might have convened a meeting of all the structural engineers to assess Mr. Martin's significant new allegation. He might have requested Mr. Wilkins of the City of Las Vegas, a disinterested party with a paramount interest in public safety, to provide his opinion. He might have weighed the cost

to the VA to make the repairs itself, the time needed for the repairs, and the cost for the VA to relocate to other facilities.

The Contracting Officer did not make these inquiries, but instead acted precipitously to issue a default termination just three days after Mr. Martin's September 9, 2002 letter. In the default termination notice, the Contracting Officer relied heavily on Mr. Martin's assertion that the Medical Clinic was unsafe for occupancy, quoting this finding in bold print in the first paragraph. (Exh. 182). The evidence, however, refutes Mr. Martin's conclusion. Perhaps the most telling evidence of building safety is that the VA remained in the building for nine months after the default termination before relocating.

This Court has established a two-part test to determine whether the Government has been constructively evicted from a leased facility: (1) Whether the landlord's acts or omissions "substantially interfered with the beneficial use or enjoyment of the premises" by the tenant; and (2) if so, whether the tenant abandoned the premises within a reasonable time. Richardson, 17 Cl. Ct. at 357. The overwhelming evidence here demonstrates that the VA cannot show constructive eviction. According to J.H. Millstein et al., GSBCA Nos. 7665, 7904, 86-3 BCA ¶ 19,025 at 96,084, the Government must show "something of a grave and permanent nature" to support a constructive eviction theory for terminating a lease. Similarly, in Oscar Narvaez Venegas, ASBCA No. 49291, 98-1 BCA ¶ 29,690 at 147,142, the Board held that, where the Government relies upon constructive eviction to justify its termination of a lease, it must show that the living or operating conditions were so "egregious" as to constitute "substantial interference with the tenant's beneficial use and enjoyment of the leased premises." By using the building for more than five years without interruption, and by not moving from the facility for nine months after termination, the Government has not satisfied the requirements to show constructive eviction.

Moreover, the precedent cited in the Contracting Officer's default termination notice is easily distinguishable. In Richardson, for example, the Court found that the tenant government agency was "plagued with persistent and recurring problems due to plaintiff's inadequate maintenance and repair of the leased premises." Richardson, 17 Cl. Ct. at 356. The Court found that the lessor's "failure to maintain the premises . . . interfered with [the government's] beneficial use of the office space and *seriously impeded* [the government's] ability to conduct business in a normal fashion." Id. at 357 (emphasis added). The operational problems in Richardson included:

> [B]eing forced to mount computer equipment necessary to the daily operation of the office on boards to protect it from flooding; soaked and slippery carpets; mildewed walls; water-damaged supplies; having to vacate offices due to dampness; and employees being forced to mop water during business hours.

Id. at 356.  Further, the landlord in <u>Richardson</u> had not taken steps to repair the roof leaks.
<u>Id.</u>  This is a far different set of circumstances than those present at the VA's Medical Clinic
in Las Vegas.

Similarly, the facts in <u>David Kwok</u>, 90-1 BCA ¶ 22,292, are much different from the
circumstances of this case.  In <u>David Kwok</u>, the Board found many problems that impacted
the operations of the Social Security Administration ("SSA"):

> The record is rife with references to serious, as well as minor,
> deficiencies in appellant's performance.  SSA asserts that the health
> and safety of its employees and the public . . . were imperiled
> continuously during appellant's entire thirty-two month tenure as
> landlord under the lease in question.  Every time it rained, the roof
> leaked in different spots, requiring SSA to move personnel constantly,
> catch water in buckets, and move desks and files.  Carpets were
> inundated by the leaks, creating a danger of electrocution.  In addition
> to the roof, many other deficiencies persisted, frequently uncorrected
> by appellant for long periods of time, contributing to vermin infestation
> and unsanitary conditions.
>
>        * * *
>
> The evidence reflects that the toilets in the various restrooms used by
> the SSA employees as well as the public were blocked up on the
> average of at least two to three times per month, resulting in water with
> urine and fecal matter flowing throughout the offices.  Employees
> throughout the office reported they were bitten by fleas or other insects,
> at times requiring medical attention.  The premises were described as
> "infested" by fleas and roaches.  Mice ran through the offices and
> employees complained of being sickened by the stench of dead mice.
> Evidence of rats was found in various offices.  One memo referenced
> an SSA telephone call complaining of the presence of a dead mouse in
> the lunch room that had not been removed in three days.

Id. at 111,957-58, 111,959-60.  Obviously, conditions in the <u>David Kwok</u> case are not
comparable to those at the VA's Las Vegas Medical Clinic.  As Plaintiffs note, the VA's
Secretary Principi described the VA Medical Clinic as a "beautiful" building in February
2002, just one month before Mr. Martin issued his preliminary report.  (Exh. 271 at 6;
Principi, Tr. 903).

The circumstances here are more like those in <u>Oscar Narvaez Venegas</u>, ASBCA No.
49291, 98-1 BCA ¶ 29,690.  In that case, the Contracting Officer terminated a lease for

default, citing evidence of a water leak, air conditioning failures, insufficient electrical capacity, roof leaks, and concerns about the structural integrity of the building's support beams. Despite these conditions, the Board found that the Government's default termination was improper. The Board distinguished the Richardson and Kwok decisions, stating "[i]n the appeal at bar, no such egregious conditions were shown to have resulted from the water problems in the leased residence[,]" and concluding "Respondent did not establish a constructive eviction." Oscar Narvaez Venegas, 98-1 BCA at 147,142.

The Government in this case also did not abandon the premises within a reasonable time, thus failing to satisfy the second part of the constructive eviction test. Remaining in the Medical Clinic for nine months after the termination notice cannot be regarded as an abandonment within a reasonable time.

> D.      The VA Breached the Lease by Failing to
>         Allow Moreland to Repair Latent Defects.

The Contracting Officer criticized Moreland in the default termination notice for failing "to make satisfactory progress to repair and remediate the structural deficiencies in the building[.]" (Exh. 182). The evidence does not support this attack. Instead, the record shows that the VA prevented Moreland from repairing its own building in 2002 until after the September 12, 2002 default termination. The VA notified Moreland of structural concerns requiring repair, but then demanded a "comprehensive remediation plan" from Moreland before allowing the repairs to go forward. No provision of the Lease required a "comprehensive remediation plan" from Moreland, nor was it clear what the VA regarded as a "comprehensive remediation plan."

Under the Warranty and Guaranty provisions of the Lease, when the VA provided notice to Moreland of defects requiring repair, the VA was required by contract to afford Moreland access to its own building to make the repairs. The Lease did not allow the VA to notify Moreland of the defects, prevent Moreland from making the repairs, and then terminate the Lease for default for Moreland's failure to make repairs. The extra-contractual demand for a "comprehensive remediation plan" was inappropriate because the VA used this demand as a means of preventing Moreland from fulfilling its obligations under the Warranty and Guaranty provisions of the Lease. This VA action excused Moreland of its duty to make the repairs within a reasonable time. The requirement that Moreland cure these deficiencies within 30 days under the "Default by Lessor During the Term" clause became unenforceable when the VA prevented Moreland from making repairs.

The VA prevented Moreland from performing repairs from as early as January 2002. When Moreland attempted to correct certain cracks on the exterior of a concrete column, which Moreland attributed to the precast panels, the VA prevented Moreland from making

the repairs pending review and approval by JAMA.  (Exh. 51, 83).  Later, after the VA had issued a Cure Notice to Moreland, the VA's General Counsel stated to Moreland's Las Vegas counsel that "[i]n no event, however, will any remediation work be undertaken until the Martin report, as supplemented, is presented to VA with VA then determining the most appropriate course of action."  (Exh. 88).

Even when Moreland retained an eminently qualified structural expert, Dr. David Malone, the VA still would not accept Dr. Malone's proposed plan as a reasonable means of moving ahead.  Following an apparently productive July 8, 2002 meeting in Washington, D.C., and a July 11, 2002 meeting in Las Vegas, the parties appeared to be on track toward a plan for repairs.  However, the Contracting Officer responded that "your plan is insufficient as it does not provide sufficient detail nor a comprehensive approach to investigating all of the structural deficiencies specified in the JAMA report."  (Exh. 152).  This letter added "you may not initiate your inspection of the [Medical Clinic] until a more detailed and comprehensive plan is provided for review and approval."  Id.

Thereafter, Dr. Malone submitted another plan on August 9, 2002 addressing all of the VA's concerns.  (Exh. 164).  Dr. Malone testified that this report was "comprehensive" and provided a detailed repair protocol for the missing gusset welds, the steel column loadings, and the cracks in the precast panels.  (Malone, Tr. 1198-99, 1202-12).  Even this plan did not satisfy the VA's consultant, Mr. Martin, who notified the VA of his reservations about Dr. Malone's report.  (Exh. 170).  The Contracting Officer then gave Moreland two days' notice of authorization to proceed, but only if Moreland executed an Indemnification and Reimbursement agreement.  (Exh. 172 at 2).  Such an agreement was not a requirement under the Lease, and the VA should not have proposed it as a condition to Moreland's entry to the building.

Ultimately, Moreland did not have access to the building to perform the repairs until after the VA's default termination.  Dr. Malone testified that all of the "essential" repairs could have been made within 30 days, with repair work performed on nights and weekends during the VA's hours of non-operation.  (Malone, Tr. 1247).  The VA retained the right to arrange for the repairs itself under the Warranty and Guaranty provisions, but apparently did not consider this alternative approach.

     E.    The Contracting Officer Abused His Discretion
            by Terminating the Lease for Default.

Even if the VA could demonstrate that Moreland was in technical default under the Lease, the Contracting Officer abused his discretion in deciding to terminate the Lease for default.  If a contractor is in default, that fact affords the Government the *right* to consider whether to terminate for default, but it does not *require* the Government to terminate for

default.  The case law and applicable regulations mandate that a contracting officer must apply *reasoned discretion* in making a decision.  See FAR § 49.402-3, "Procedure for default;" see also Darwin Constr. Co., Inc. v. United States, 811 F.2d 593, 596 (Fed. Cir. 1987) (citing Schlesinger v. United States, 182 Ct. Cl. 571, 581, 390 F.2d 702, 709 (1968)).  Moreover, a default termination will be set aside if it is arbitrary, or capricious, or constitutes an abuse of the contracting officer's discretion.  McDonnell Douglas Corp. v. United States, 182 F.3d 1319, 1326 (Fed. Cir. 1999) (citing Darwin, 811 F.2d at 598).

In the present case, the VA continuously occupied the Medical Clinic from the day that the lease term began.  As noted above, Dr. Malone credibly testified that, if the VA had permitted, Moreland could have performed all of the necessary repairs quickly and without interrupting any of the VA's operations.  (Malone, Tr. 1247).  The building was entirely safe for occupancy.  Faced with this relatively simple and painless option to move forward under the existing Lease, the Contracting Officer opted instead to terminate the Lease for default and move to other facilities nine months later.  In so doing, the cost to the VA was approximately *$4,000,000 per year greater than if the VA had remained in the Medical Clinic facility*.  (Szwarcman, Tr. 427).  Thus, instead of paying approximately $2,140,000 per year at the Medical Clinic, the record suggests that the VA paid more than $6,000,000 per year in relocating to other facilities.  This was an irrational decision by any measure, and one that cannot have resulted from the exercise of reasoned discretion.  The VA has not claimed any of these increased costs against Moreland.

Plaintiffs have argued that the VA's real motive was to move eventually to a new facility better able to accommodate the rapid population growth in the Las Vegas area.  Plaintiffs offered evidence of many statements and press releases from 2002 in which Nevada Congresswoman Shelley Berkley, Secretary Principi, and others spoke negatively of the Medical Clinic, and of a desire and to move to a new and larger facility.  See, e.g., Exh. 80, 109, 271, 277, 278.  Plaintiffs state that the VA actually made the decision to terminate Moreland for default on June 20, 2002, which would explain why the VA would not thereafter permit Moreland to make any repairs.  (Exh. 137 at 2; Principi, Tr. 941).  While factual findings concerning the VA's longer term expansion and relocation plans in Las Vegas are unnecessary to the Court's decision, it may be that Plaintiffs' assessment of the VA's motive is correct.  Certainly, the Court can see no other explanation from the record, except perhaps bureaucratic ineptitude, to account for such a senseless decision.

F.    The VA Breached the Covenant of Good Faith and Fair Dealing.

If there were any doubt of the impropriety of the VA's default termination, the VA still could not prevail in this case because of its breach of the covenant of good faith and fair dealing.  An implied term of every contract, including Government contracts, is that each party will act in good faith toward the other, and that a party may be found to have breached

the contract by acting in bad faith.  See, e.g., Centex Corp. v. United States, 395 F.3d 1283, 1304 (Fed. Cir. 2005); Link v. Dept. of Treasury, 51 F.3d 1577, 1582 (Fed. Cir. 1995).  A breach of the covenant of good faith occurs when there has been "sharp dealing," such as taking "deliberate advantage of an oversight by your contract partner concerning his rights under the contract."  Mkt. St. Assocs. L.P. v. Frey, 941 F.2d 588, 594 (7th Cir. 1991).  See also North Star Alaska Housing Corp. v. United States, 2007 WL 1041442 (Fed. Cl. Apr. 2, 2007).  The Federal Circuit has stated that a party must establish a breach of this covenant by clear and convincing evidence.  Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239-40 (Fed. Cir. 2002); but see Tecom, Inc. v. United States, 66 Fed. Cl. 736, 771 (2005) ("[t]he presumption of good faith conduct of government officials has no relevance" with respect to "claims that the duties to cooperate and not hinder performance of a contract have been breached," and in such cases, proof of a violation need not be by clear and convincing evidence).

In the present case, the conduct of certain VA officials was deplorable by any measure, be it "clear and convincing" or some lesser standard.

The first instance of VA bad faith arose when Moreland submitted contract claims to the VA relating to construction of the facility.  One claim, dated May 4, 1998, was for $153,614.07 for added labor cost from April through August 1997. (Exh. 12, 13).  A second claim, dated August 21, 1998, was for $235,800.40 for the added costs of project supervision from April 1997 through January 1998.  (Exh. 11).  The second claim amended and superseded an earlier claim by Moreland for extra supervisory costs, dated April 22, 1998. Id.  These claims together totaled $389,414.47.

The Contracting Officer, Dudley Schadeberg, testified at trial that he reviewed these Moreland claims and found that they had merit.  (Schadeberg, Tr. 2208-09; Exh. 12).  He prepared a draft final decision that would have allowed $131,345.51 of the added labor cost claim.  (Exh. 12 at 3).  He testified that he would have allowed approximately $165,000 for the added supervisory cost claim.  (Schadeberg, Tr. 2209).  In total, Mr. Schadeberg was prepared to allow nearly $300,000 in a final decision for these claims.  Id.

Mr. Schadeberg explained at trial why he did not grant these claims, even though he had determined that they ought to be paid:

> Q.  So at the time that you issued your final decisions with respect to both claims on July 17, 2000, you had already made a decision that Moreland was due in total for both of those claims approximately $300,000?  If you take $165,000 plus the $131,000?
>
> A.  If it's a rounded number, I'd agree with your statement.

Q.  Okay.  Do you recall why you did not issue a final decision or a unilateral modification for the amounts that you determined were due and owed Moreland Corporation for those particular two items?

A.  To the best of my recollection, I was working with VA general counsel, and they were working on trying to arrive at a settlement with Moreland.  And we were also within the window of going to the Board of Veterans' Appeals on some or all of these different claims, and it was upon the advice of counsel that we did not grant any relief at that time.

Q.  Just so we're clear, government counsel directed you not to grant any entitlement to the dollars you found were due and owed on the basis of other claims that were pending for purposes of negotiations, correct?

A.  I think they were trying to get a global settlement of all of the claims.  I'm not really sure about the details because it was never told, but I deferred to their counsel.

(Schadeberg, Tr. 2209-10).  Thus, instead of granting Moreland's meritorious claims, the Contracting Officer followed the advice of agency counsel to deny the claims so that the agency would have greater leverage in negotiating other claims.

Under the Contract Disputes Act, a contracting officer's review of certified claims submitted in good faith is not intended to be a negotiating game where the agency may deny meritorious claims to gain leverage over the contractor.  The law requires contractors to certify that their claims are "made in good faith," that all "supporting data are accurate and complete to the best of [the contractor's] knowledge and belief," and that the amount requested "accurately reflects the contract adjustment for which the contractor believes the government is liable."  41 U.S.C. § 605(c)(1).  Certainly, a reciprocal obligation to act in good faith should apply to the Government.  As the Court noted recently in Lavezzo v. United States, a contracting officer is obligated to "put his own mind to the problems and render his own decisions."  Such decisions must be "personal [and] independent," and "even the appearance of coercion [must] be avoided."  74 Fed. Cl. 502, 509 (2006).  The Contracting Officer's outright denial of meritorious contractor claims to gain some advantage over the contractor will not be condoned by this Court.

A second instance of the VA's bad faith occurred when the VA attempted to impose upon Moreland the obligation to perform a structural loading study to determine whether the VA could safely install an auxiliary heating ventilating and air conditioning ("HVAC")

system on the roof of the facility.  The VA's Office of Inspector General ("OIG") issued a report in June 1999 addressing deficiencies involving the Medical Clinic's HVAC system. (Exh. 10 at 17-19).  The OIG sought to determine why the Ambulatory Surgery Suite had not been put into service, and whether the HVAC system should be upgraded.  Id. at 17.  The OIG recognized that the HVAC deficiencies were the VA's responsibility "because the accepted construction work had been substantially in compliance with contract specifications."  Id. at 17-18.  The OIG recommended that the VA "award a contract to identify, conclusively and comprehensively analyze, and correct the deficiencies."  Id. at 17.

Rather than taking responsibility for the desired study, as the OIG had recommended, the VA attempted to have Moreland undertake this study at no cost to the VA.  In a May 2001 internal memorandum, the VA explained why it dispatched Mr. Kharaiti Abrol (a VA engineer) to Las Vegas in November 2000:

> As an offshoot to the Ambulatory Surgery Study completed last year, questions arose regarding the ability of the structure of the [Medical Clinic] to support the additional weight of additional mechanical equipment required to correct heating, ventilating and air conditioning (HVAC) deficiencies should a decision be made to proceed with correction of the deficiencies identified in the study . . . .  After discussion with Peter Verdoljak of the VISN office in early October, 2000, a decision was made to request a site visit by the Headquarters (HQ) structural engineer, Kharaiti Abrol.

(Exh. 33 at 1).

After visiting the Medical Clinic in November 2000, Mr. Abrol prepared a two-page set of "Structural review comments" on the facility.  (Exh. 17 at 2-3).  Although Mr. Abrol explained that "a thorough review was not possible," he described in his report "many structural deficiencies" in the building.  Id. at 2.  Upon receipt of Mr. Abrol's December 13, 2000 report, the Contracting Officer, Mr. Schadeberg, forwarded the report to VA officials in Las Vegas, stating:

> The attached memo contains the comments & conclusions by our VACO Kharaiti Lal Abrol.  I instructed him earlier today to send it to you via E-mail also.  *This should provide the necessary justification for you to request that the lessor, Moreland Corporation, contract for and have conducted a comprehensive structural study of the [Medical Clinic], at no cost to the Government.*

Id. (emphasis added).  Sure enough, the VA forwarded Mr. Abrol's two-page report to Moreland on January 9, 2001, requesting Moreland to "conduct a comprehensive independent structural study including seismic and wind analysis." (Exh. 18).  The VA also asked for a timeline for the completion of the study, the right to sanction the scope of work, and the right to approve the firm selected by Moreland.  Id.  After consulting with its project architect and engineer, Moreland declined to perform the requested study.  In the course of these consultations, Moreland's engineer described the Abrol report as "extremely inflammatory and unsubstantiated."  (Exh. 23).  Moreland's architect was even more incensed, asserting that the VA had engaged in "libel, slander, business defamation, tortuous interference with contractual relations, potential unfair trade practice violations . . . and potential conspiracy to damage our professional reputation and ability to do business with the federal government."  (Exh. 24).  The VA's bad faith conduct preceded the contentious exchanges between the parties in 2001 and 2002.

Even if Moreland were in technical default of its obligations under the Lease, the Court would not uphold a default termination where the agency has acted in bad faith in the administration of the Lease.  See Libertatia Assocs., Inc. v. United States, 46 Fed. Cl. 702, 712 (2000) ("In view of the court's finding of bad faith on the part of the government, it is difficult – if not impossible – to assess whether the administration of the contract and the resulting termination for default was arbitrary and capricious because the evidence of default itself is tainted by bad faith.").  Similarly here, the agency's bad faith compels the Court to overturn the termination for default.

G.    Moreland's Statements in the Nevada Lawsuit
       Do Not Constitute Admissions Against Interest.

Much of Defendant's position is centered upon statements that Moreland made in the 2002 lawsuit against its general contractor and others in the U.S. District Court for the District of Nevada. Moreland Corp. et al. v. RMA, Inc. et al., No. CV-S-02-1259-JCM -PAL (D.Nev., filed Sept. 26, 2002). (Exh. 285).  Two weeks after the VA terminated the Lease for default, Moreland filed the Nevada suit to recover the costs of investigating and repairing the structural damages at the Medical Clinic, as well as damages that may result from the lease termination.  (Exh. 285).  Apparently recognizing their contractual obligation to compensate Moreland for the costs of repairing the defects, the defendants settled the lawsuit with Moreland with a payment of $1,100,000 in October 2003.  The proceeds of that settlement did not cover any of Moreland's losses from the VA's termination of the Lease.

The pleadings from the Nevada lawsuit generally do not contain statements by Moreland that are inconsistent with its position in this case.  There is nothing in the Nevada lawsuit to substantiate Defendant's position that Moreland acknowledged the validity of the default termination.  More accurately, Moreland asserted in the Nevada lawsuit that, if the

VA's allegations regarding termination were correct, then the contractors and insurers were contractually liable to Moreland for any resulting damages. Moreland made no representations as to whether the termination was proper or improper, or whether Moreland had timely responded to the VA's demands regarding inspection and repair.

Principally, Defendant contends that Moreland's statements in the Nevada lawsuit concede that the Medical Clinic was not code-compliant. Defendant essentially asserts that Moreland has been in default since the inception of the Lease because of these alleged code violations. However, because Moreland is the owner and lessor of the building, and the agency is the lessee, this is not a case where the Government determines if the facility is code-compliant. Moreland was required to follow all building codes, ordinances, and inspection criteria mandated by the City of Las Vegas. Once the local building authority completed its inspections and issued a Certificate of Occupancy, the VA had no legal rights to terminate the Lease by asserting its own interpretations of code compliance. The Lease provided that the "[s]pace offered must have a current occupancy permit issued by the local jurisdiction" (exh. 1 at 154, sec. 9.1), that the "space must be . . . constructed in accordance with . . . local code requirements (id at 110, sec. 1.3), and that "[l]essor shall . . . be responsible for obtaining any necessary licenses and permits, and for complying with any Federal, State, and municipal laws, codes, and regulations applicable[.]" Id. at 43, sec. D.25.

Moreland delivered to the VA a building that complied with the requirements of the Uniform Building Code, as evidenced by the Certificate of Occupancy issued by the Las Vegas City Building Official, Paul Wilkins. (Exh. 7). Mr. Wilkins issued this certificate after a process in which Las Vegas Building Department officials examined the plans, issued construction permits, conducted inspections during construction, and determined that Moreland was in compliance with "the various ordinances of the city regulating building construction." (Wilkins, Tr. 2271-73; Malone, Tr. 1247-48). The City of Las Vegas never revoked this certificate. (Wilkins, Tr. 2281, 2302). Mr. Wilkins testified unequivocally that "[a]s far as I am concerned, I need to tell you that I thought and still think that the building is a safe building." (Wilkins, Tr. 2281).

Defendant emphasizes a Moreland interrogatory answer in the Nevada litigation stating that in August 2002, Moreland "did not have the financial resources to move forward." (Exh. 287, response to Interrogatory 16). Mr. Moreland explained at trial that the company, though in some financial distress, was able to borrow or rely upon its credit to obtain the necessary resources to correct the defects. (Moreland, Tr. 1824, 1846, 1856). This time period, August 2002, is when Moreland had already retained Exponent's Dr. Malone. With his guidance, Moreland was preparing to make the necessary repairs. There is no evidence that Moreland's financial condition prevented it from performing the required tasks or repair work. Placed in context, the Court does not regard Moreland's interrogatory response from the Nevada suit as an inconsistent statement.

Moreover, the doctrine of judicial estoppel does not apply to this case.  The Court has described the necessary elements for judicial estoppel as follows:

> First, a party's later position must be "clearly inconsistent" with its earlier position.  Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled.  Finally, [a] third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

Cuyahoga Metropolitan Housing Authority v. United States, 65 Fed. Cl. 534, 556 (2005) (citing New Hampshire v. Maine, 532 U.S. 742, 751 (2001)).

Here, Moreland's statements in the two actions are not clearly inconsistent.  In the Nevada suit, Moreland described the problems at the Medical Clinic in terms of the VA's allegations, or JAMA's allegations.   In the present suit, Moreland has at all times acknowledged that defects existed which required repairs.   The Court sees nothing inconsistent in Moreland claiming the costs of investigation and repair in the Nevada suit, and in challenging the VA's default termination in this Court.

A further point is that judicial estoppel does not apply where a party settles the claim in which it is alleged to have made an inconsistent statement.  Water Technologies Corp. v. Calco, 850 F.2d 660, 665-66 (Fed. Cir. 1988) (in such cases, judicial estoppel cannot be "invoked to preclude [the party] from taking a position inconsistent with its earlier pleading or interrogatory answer" because "there has been no judicial acceptance of the asserted inconsistent position."); First Nationwide Bank v. United States, 56 Fed. Cl. 438, 444 (2003) (judicial estoppel cannot be invoked where litigation was settled because "[t]he court cannot go behind the settlement in an attempt to reconstruct which positions merit judicial endorsement.").

Finally, even if Defendant could identify an inconsistent statement by Moreland in the Nevada litigation, Moreland should not be placed in a position of having to choose at its peril which legal action to pursue – suing its general contractor and associates for failing to make building repairs, or suing the United States to challenge the VA's default termination. Parties are free to make alternative fact allegations in cases of doubt, provided the allegations are made in good faith:

> Alternative fact allegations made in good faith and based on genuine
> doubt are not admissions against interest so as to be admissible in
> evidence against the pleader.  The pleader states the facts in the
> alternative because he is uncertain as to the true facts.  Therefore, he is
> not "admitting" anything other than his uncertainty.

Douglas Equip. Inc. v. Mack Trucks, Inc., 471 F.2d 222, 224 (7th Cir. 1972).  These words
have direct application here.  In addition to the costs of repair, Moreland essentially was
seeking indemnification from the defendant companies in Nevada if the VA prevailed in its
default termination.  In order to preserve its rights, Moreland had to assume and plead that
the default termination might be upheld.  Moreland should not be penalized here for pleading
a valid cause of action in Nevada.

H.    Damages

The Court finds that Moreland is entitled to recover the net unpaid rent that it would
have received during the remainder of the 15-year term of the lease.  The rent due, less
operating costs, is $13.61 per square foot per year. (Exh. 1 at 4).  The rental period under the
15-year term began on June 1, 1997 and extended until May 31, 2012.  (Exh. 1 at 5;
Moreland, Tr. 1752-53, 1758).  The beginning date for calculating damages is July 1, 2003,
the date on which the VA no longer occupied the building. (Stip. 39).  Of the total of 180
monthly rental payments to be made under the 15-year lease, the VA made 73 of those
payments, leaving 107 months unpaid. (Moreland, Tr. 1759).  The monthly payment can be
calculated by multiplying $13.61 (net rent per square foot), by 148,260 square feet, divided
by 12 months, for a total of $168,151.55. (Exh. 282; Moreland, Tr. 1759).  The total unpaid
rent for 107 months is $168,151.55 times 107, or $17,992,215.85.

This calculation is consistent with the approach followed in J.H. Millstein, 86-3 BCA
at 96,084 (in a lease wrongfully terminated by the Government, the Board awarded the lessor
the rental payments called for by the lease through "the earliest date on which the
Government could have legally terminated the lease in question.").  The calculation above
grants Moreland the amount of rent it would have received if the VA had occupied the
Medical Clinic for the required 15-year term.  There is no indication that Moreland received
any revenue from re-renting the building, or that it will receive any rental revenue in the
future, and thus there is no credit to apply against the Government's payment of net rental
damages.[9]  Similarly, the amount for which Moreland settled its Nevada lawsuit against the
general contractor and others did not compensate Moreland for lost rent, and should not be

---

[9] Evidence suggests that VA representatives ransacked the building to some extent upon
departure. (Moreland, Tr. 1745-46).  Also, the building had been customized for the VA as a
single-purpose facility.  These factors among others hampered Moreland's attempts to re-rent or
sell the facility after termination.  (Moreland, Tr. 1747-49).

considered a credit to the Government. This amount was to reimburse Moreland for the costs of investigating and repairing the building.

Defendant's argument that the standard "Termination for Convenience of the Government" clause, FAR ¶ 52.249-2, prevents Moreland from recovering unpaid future rent is without merit. Defendant cites the standard "Default" clause, FAR ¶ 52.249-8(g), which states:

> If, after termination, it is determined that the Contractor was not in default, or that the default was excusable, the rights and obligations of the parties shall be the same as if the termination had been issued for the convenience of the Government.

FAR ¶ 52.249-8(g). While the standard "Default" and "Termination for Convenience of the Government" clauses were incorporated in the Lease by reference in Schedule F, Section C, "Contract Clauses," (Exh. 1 at 26), it is necessary to examine all of the Lease clauses to determine the agreement as a whole. Hunt Constr. Group, Inc. v. United States, 281 F.3d 1369, 1372 (Fed. Cir. 2002) ("The contract must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts."); Dravo Corp. v. United States, 202 Ct. Cl. 500, 504, 480 F.2d 1331, 1333 (1973) ("All provisions of the contract should be read together and so as to make none inoperative, and specific provisions should be given precedence over general ones.").

In the Moreland/VA Lease, certain clauses applied to the construction of the facility before the VA began its occupancy, and other clauses applied to the lease term after the VA occupied the facility and began making rental payments. With regard to a termination for convenience provision that would have afforded the VA the right to terminate during the lease term "by giving at least 180 days' notice in writing to the Lessor" (Exh. 1 ¶ 4), the parties specifically deleted that right before signing the agreement. The only way to harmonize that action with the standard "Termination for Convenience of the Government" clause (FAR ¶ 52.249-2), listed by reference in the Lease, is to acknowledge that the VA could have terminated for convenience during the construction phase, but not after the VA took occupancy and began making rental payments.

This interpretation is supported strongly by the existence of a separate "Default by Lessor During the Term" provision, governing the VA's right to terminate for default after the VA began the lease term. (Exh. 1, General Clauses, ¶ 16, Section 552.270-33). The Contracting Officer cited this clause, *not* the standard "Default" clause from FAR ¶ 52.249-8, as the basis for the default termination on September 12, 2002. The "Default by Lessor During the Term" provision does not refer to the standard "Termination for Convenience of the Government" clause (FAR ¶ 52.249-2), and therefore does not convert an improper default termination into a termination for convenience.

Thus, we have an agreement in which the VA could have terminated for convenience during construction under FAR ¶ 52.249-2, paying Moreland its incurred costs of construction, but in which the VA relinquished that right after the lease term began. Similarly, the VA could have terminated Moreland for default during construction under FAR ¶ 52.249-8 (if, for example, Moreland failed to construct the building). After the lease term began, however, the applicable default clause was the "Default by Lessor During the Term" provision. This latter clause does not convert an improper default termination into a termination for convenience. The Contracting Officer acted consistently with this interpretation in citing the "Default by Lessor During the Term," rather than the "Default" clause from FAR ¶ 52.249-8, as the basis for his September 12, 2002 termination notice. (See Exh. 182). Defendant's counsel is in error in basing the Government's defense on the FAR ¶ 52.249-8 "Default" clause, which no longer applied after the lease term began.

Moreland, however, is not entitled to recover the value of the building that it lost through foreclosure. While the Court may logically surmise that Moreland was adversely impacted by the VA's default termination, the record does not support a conclusion that the termination caused the foreclosure. The Court does not have before it Moreland's or LVVA's bank loan agreement(s), and therefore cannot say what the terms of the loan(s) were, what Moreland's rights under the agreement(s) may have been, or whether Moreland had any recourse against the bank(s) following the VA's default termination. The Court also does not know whether Moreland had the means to pay the balance of the loan(s), or to refinance the loan(s) to retain the asset. Although Moreland's witnesses have testified about the effect of the foreclosure, and have offered appraisals of the property, the absence of probative evidence prevents the Court from finding that the VA's default termination caused the foreclosure.

## Conclusion

Based upon the foregoing, the Clerk of the Court is instructed to enter judgment for Plaintiffs in the amount of $17,992,215.85, plus interest as allowed under the Contract Disputes Act from the date the Contracting Officer received Plaintiffs' certified claim until the date of payment. See 41 U.S.C. § 611. Depending upon the date of payment, Defendant should pay interest only on the lease payments that should have been made as of that date. Defendant also should receive a discount for paying the balance of the lease payments earlier than required under the Lease. The parties may request the Court's assistance if they cannot agree on the appropriate interest or discount calculations.

Pursuant to RCFC 54(d), costs are awarded to Plaintiffs. The Court will consider an application for attorneys' fees from Plaintiffs under 28 U.S.C. § 2412 if they believe they are eligible to apply.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge